UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| Wayne Boyd and | ) | Civil Action No.: 4:13-cv-00599-RBH |
| Whitfield R. Boyd, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| Sysco Corporation, | ) | |
| Sysco Corporation Group Benefit | ) | |
| Plan, and United Behavioral | ) | |
| Health, | ) | |
| | ) | |
| Defendants. | ) | |

Pending before the court are the parties' memoranda in support of judgment.[1]  Plaintiffs assert entitlement to certain benefits pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) (i.e., a claim for benefits)[2], and request attorney's fees pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g), and prejudgment interest.[3]

The parties entered into a Joint Stipulation agreeing to certain relevant portions of the administrative record and certain relevant portions of the plan documents.  However, Plaintiffs do not stipulate that this is the complete record due to "Defendants' many errors and omissions in

---

[1] Plaintiffs' Memorandum in Support of Judgment (ECF No. 46) and Defendants' Memorandum in Support of Judgment (ECF No. 47); Plaintiff's Reply (ECF No. 52) and Defendant's Reply (ECF No. 51).

[2] This Court granted the defendants' motion for summary judgment on September 3, 2015 as to the second cause of action which was an ERISA penalty claim pursuant to 29 U.S.C. § 1132(c). (ECF No. 55) The case is now before the Court on the claim for benefits.

[3] Under Local Rule 7.08, "hearings on motions may be ordered by the Court in its discretion.  Unless so ordered, motions may be determined without a hearing."  The issues have been briefed and the administrative record has been submitted by the parties, and the Court believes no hearing is necessary.

compiling the record". (Jt. Stipulation, ECF No. 48, p. 4) Plaintiffs also object to the defendants' inclusion in the record of a document entitled "Practice Guideline for the Treatment of Patients with Substance Use Disorders, Second Edition", by the American Psychiatric Association (APA), UBH 916-923, on the basis that it was not furnished to the plaintiffs in response to the limited requests for production of documents authorized by the Court and was disclosed for the first time on the day before the deadline for filing memoranda in support of judgment. The parties also do not agree on the appropriate scope of this Court's review. The defendants assert that an abuse of discretion scope of review applies because the plan documents confer discretion upon them to interpret the plan. They also assert that the Plan Administrator has delegated that discretion to UBH, the Claims Administrator. The plaintiffs contend that, although the Plan language appears to vest discretion in Sysco, "repeated procedural and substantive violations by Defendant mean that this Court should review the administrative denials *de novo*." (Jt. Stipulation, p. 2, ECF No. 48) The parties agree that the standard of review is not affected by a conflict of interest, as the Plan is self-funded by Sysco, and UBH is the claims administrator. The parties also agree that the Court may dispose of this matter based upon the joint stipulation, the attachments thereto, and the memoranda in support of judgment, except that the plaintiffs assert that the Court may also need to reference Plaintiff's Motion for Discovery and related filings, Defendants' discovery responses to the limited discovery allowed by the Court, and the plaintiffs' motion to compel.[4]

---

[4] The Fourth Circuit has recognized that the parties to an action for ERISA benefits may agree to waive the summary judgment standard and submit their case to the district court on the merits by way of cross-motions for judgment. *See Bynum v. Cigna Healthcare of N.C., Inc.*, 287 F.3d 305, 311 n.14 (4th Cir. 2002), *abrogated on other grounds* by *Carden v. Aetna Life Ins. Co.*, 559 F.3d 256 (4th Cir. 2009).

**Procedural Overview**

Plaintiff Wayne Boyd's employer, Sysco Corporation, ("Sysco") established an employee welfare benefit plan to provide various benefits to employees and their families. The plan is entitled "Sysco Corporation Group Benefit Plan" ("the Plan") (UBH 0870-0900). Under the Plan documents, Sysco is the plan administrator, and the Plan Administrator may delegate its duties and discretionary authority to a third party Claims Administrator.[5] Defendant United Behavioral Health (UBH) is the Plan's designated Claims Administrator for mental health and substance abuse claims. (2009 Benefits Guide-Summary Plan Description (SPD) (UBH 0018)). Wayne Boyd was a participant in the Plan and his son, Whitfield R. Boyd ("Boyd") was a covered beneficiary.

The Plan provides[6] that a covered medical expense "must be medically necessary, must meet accepted standards, must be covered by the Healthcare Program." (UBH 103) The Plan does not cover services that "are not medically necessary, as determined by the claims administrator." (UBH 106)   The Glossary of Key Terms for Healthcare Program contains the following definitions:

**Medically Necessary.** A treatment, confinement or service prescribed by a physician which is determined by the Claims Administrator to be necessary and appropriate for the diagnosis, care or treatment of the disease or injury involved, non-experimental or non-investigational and not in conflict with accepted medical standards.

(UBH 0155)

The Plan provides for an initial claims determination and an appeal within the Plan. (UBH 0880-0881)

---

[5] The Plan defines the term "Claims Administrator" with respect to benefits provided on a self-insured basis as "the person or entity providing claims processing, payment, and other administrative services to the Plan". (UBH 0875)

[6] The appeal letters do not contain any references to these plan provisions.

## Factual Background and Filing of Claim

A.    Plaintiff Whitfield Boyd's Claim for Benefits for Residential Substance Abuse Treatment.

This case involves Boyd's claim for mental health/substance abuse benefits under the Plan for treatment received by him at a residential rehabilitation program, Narconon Vista Bay, California, from July 23, 2010 through August 26, 2010.[7]  The administrative record contains an affidavit by Wayne Boyd which was submitted to UBH on November 19, 2012 by counsel for the plaintiff[8] in which Mr. Boyd summarizes the history of his son's drug addiction and the unsuccessful treatments that he underwent before his stay at Narconon at Three Rivers Rehab in Columbia, South Carolina in 2006,[9] Wilmington Treatment Center in Wilmington, North Carolina in 2008[10], and a methodone clinic.  He states that he put his son on the plane to California on July 13, 2010 for detox treatment; that he notified UBH on the next day (July 14, 2010) by telephone; and that the UBH representative told him that the Narconon treatment would be covered but that a $400 penalty would be imposed for going out of network.  (UBH 0904) The affidavit does not mention August West Family Services, the medical dotoxification facility where Boyd received treatment beginning on July 13, 2010, immediately prior to the Narconon stay. The affidavit simply states that Narconon Vista Bay agreed to accept Boyd the day after his

---

[7] Boyd resided at a Narcocon facility from July 23, 2010 through December of 2010.  However, the claim before the Court is for July 23, 2010 through August 21 or 26, 2010.

[8] The November 19, 2012 letter from counsel appears to be the first written appearance of counsel for the plaintiffs.  Before that date, they apparently did not have counsel.

[9] Boyd was treated at the Three Rivers Rehab for "a little over two weeks". (UBH 0901)

[10] The Wilmington program was a thirty-day program, after which Boyd was released to a half-way house. However, he started using drugs while in the half-way house and was "kicked out".  (UBH 0902)

4

parents called.  It then states: "They met him in San Francisco and escorted him to a medical facility to help him start the initial detox."  (UBH 903) The record is not clear as to the connection, if any, between August West and Narconon.

At the time of his admission to August West on July 13, 2010, Boyd had been using "3x2 [Xanax] bars x 1 year" and "Suboxone x 2 years." The Suboxone dose was 24 mg daily. (UBH 0793, 0798) He was, upon admission, "poly drug dependent: Xanax + Suboxone." (UBH 0793) Those facts are listed under "Axis I," which is the category in the DSM for acute conditions needing treatment. (UBH 0793) Under close supervision by physicians at August West, Boyd was tapered off of Suboxone and Xanax and prescribed phenobarbital for alcohol withdrawal. (UBH 0794-798) The records reflect tremors, sweats, diarrhea, anxiety/agitation, muscle cramping and sleeplessness. (UBH 0801) Boyd went through withdrawal for ten days, with the withdrawal symptoms gradually decreasing over the course of the ten day medical treatment (UBH 0799). The taper (i.e., a physician prescribing smaller and smaller dosages of the drugs to which he was addicted) lasted through July 22, 2014, the date on which Boyd took his last tapered dose of suboxone. (UBH 0797) The July 22 medical record states that Boyd "completed his detox protocol and will transition to [Narconon] tomorrow to begin his program." (UBH 0799) Boyd then transferred directly to the longer-term rehab program at Narconon. Upon admission, Boyd's doctor noted his "second failed rehab." He also noted "opiate dependence" and "new tracks" (i.e, new needle marks in Boyd's arms). (UBH 0611) Boyd completed a drug history upon his arrival at Narconon that showed his oxycontin use started eight years prior, and his Xanax use started six to seven years prior. (UBH 0625). The history given at Narconon also showed use of heroin, cocaine, crack cocaine, hashish, marijuana, LSD, PCP, and Ecstacy. (UBH 0625) The Narconon

5

records reflect that Boyd had continued using oxycontin and Xanax right up until July 12, 2010, the day before his trip to California. (UBH 0625) In the thirty days leading to that admission, he had used more than one drug twenty-seven out of thirty days. (UBH 0626). Boyd stayed in the Narconon program for its full course, successfully completed it, and was discharged on December 18, 2010. According to Boyd, "I can state with no hesitation that my rehab at Narconon saved my life." (UBH 0255)

   B.  <u>UBH Case Notes</u>.

The internal UBH Case Notes indicate that Wayne Boyd called UBH on October 7, 2010 and stated that he was "looking for benefits for OON facility where his son is staying" and that the facility had been billing the wrong insurance company.   (UBH 0314) In a Retrospective Review on July 7, 2011, the case was summarized as follows:

> 23 yr old mbr admitted for treatment of opiate dependence.   Med record: 8271117590464.  Drug of choice: oxycontin 80 mg/heroin .2, both daily.  Previous treatment is two programs, level of care not indicated.  The information is primarily intake information.  There are no clinical progress notes by any mental health staff so it is not clear what kind of treatment occurred, interventions used or when the member was discharged.  Hence no decision can be made re: med nec for continued treatment at this level of care or what kind of care was provided . . . Will advise claims dept to obtain a complete med record."  (UBH 0316)

In a Retrospective Review dated August 9, 2011, the case manager's assessment is as follows:

> THE TREATMENT MODEL DOES NOT MEET UBH LEVEL OF CARE GUIDELINES AND BEST PRACTICE GUIDELINES AS DEFINED BY THE APA[11].  THE MODEL FOR THIS PROGRAM . . . DOES NOT MEET LEVEL OF CARE GUIDELINES AS DEFINED BY UBH.  IT IS A DRUG-FREE EDUCATIONAL PROGRAM, COMPRISED OF A PRESCRIBED SERIES OF

---

[11] American Psychiatric Association

> COURSES AND WORKSHOPS.  DETOXIFICATION IS ACCOMPLISHED BY
> SAUNA, EXERCISE, AND NUTRITIONAL SUPPLEMENTS.
> Level of Care Guidelines not met: "Any one of the following", 2a, b; 3, 5a, 7b.
> Also, the treatment model is not consistent with APA Best Practices Guidelines
> (can be found at www.psychiatryonline.com-Section I, Executive Summary, B,
> General Treatment Principles.

The reviewer also noted that medical records had been received by UBH on 6-24-11.  However,

the note does not indicate which medical records had been received.

UBH conducted another retrospective review on October 6, 2011, and the reviewer

summarized the case as follows:

> CCR review of a course of RTC for a 23 yo male using Xanax, Valium, Suboxone.
> The medical record documents the patient's progress through New Life
> detoxification, and the various courses and assignment, as well as scattered progress
> notes about behaviors on the unit.  In general, he appeared to complete assignments
> successfully. Discharge information is not included, and some notes indicate
> continued participation as late as 12-15-10 . . .

(UBH 0318)

The case manager's assessment was the same as the one on August 9, 2011, as follows:

> THE TREATMENT MODEL DOES NOT MEET UBH LEVEL OF CARE
> GUIDELINES AND BEST PRACTICE GUIDELINES AS DEFINED BY THE
> APA.  THE MODEL FOR THIS PROGRAM . . . DOES NOT MEET LEVEL OF
> CARE GUIDELINES AS DEFINED BY UBH.  IT IS A DRUG-FREE
> EDUCATIONAL PROGRAM, COMPRISED OF A PRESCRIBED SERIES OF
> COURSES AND WORKSHOPS.  DETOXIFICATION IS ACCOMPLISHED BY
> SAUNA, EXERCISE, AND NUTRITIONAL SUPPLEMENTS.
> Level of Care Guidelines not met: "Any one of the following", 2a, b; 3, 5a, 7b.
> Also, the treatment model is not consistent with APA Best Practices Guidelines
> (can be found at www.psychiatryonline.com-Section I, Executive Summary, B,
> General Treatment Principles.

*Id.*

The notes indicate that the medical record was received by UBH on 9-29-11. Again, it is unclear

what records were received.

C. Denial of Claim

A Provider Explanation of Benefits dated October 12, 2011 indicated that the claim was denied on the basis that the "service has been determined to not be medically necessary." (UBH 0305) This was followed by an adverse determination letter[12] by T.C. Ghosh, MD dated October 18, 2011 that "coverage was not available for your treatment with Narconon Vista Bay for dates of service 7/23/10-08-26/10." (UBH 0297) Dr. Ghosh indicated in the letter that neither the diagnosis nor the diagnosis code was available. He stated that he had reviewed "your medical record for the dates of service" but does not indicate which records were reviewed.

He stated that coverage was not available for the following reasons:

> THE TREATMENT MODEL DOES NOT MEET UBH LEVEL OF CARE GUIDELINES AND BEST PRACTICE GUIDELINES AS DEFINED BY THE APA. THE MODEL FOR THIS PROGRAM . . . DOES NOT MEET LEVEL OF CARE GUIDELINES AS DEFINED BY UBH. IT IS A DRUG-FREE EDUCATIONAL PROGRAM, COMPRISED OF A PRESCRIBED SERIES OF COURSES AND WORKSHOPS. DETOXIFICATION IS ACCOMPLISHED BY SAUNA, EXERCISE, AND NUTRITIONAL SUPPLEMENTS.
> Level of Care Guidelines not met: "Any one of the following", 2a, b; 3, 5a, 7b. Also, the treatment model is not consistent with APA Best Practices Guidelines (can be found at www.psychiatryonline.com-Section I, Executive Summary, B, General Treatment Principles.

(UBH 0293)

This is a verbatim quote from the Retrospective Reviews dated August 9, 2011 and October 6, 2011. He then quoted from the **2011** UBH Level of Care Guidelines Substance Use Disorders: Residential Rehabilitation, as follows:

---

[12] Defendants characterize the October letter of Dr. Ghosh as an appeal letter and cite UBH internal notes indicating that Wayne Boyd called on September 26, 2011 requesting the status of the appeal. (UBH 0317-0318) However, the internal notes also reflect that the medical record was not received until September 29, 2011 (UBH 0319) The notes also indicate that "denial issued 10/18 will have instruction on how to file appeal." (UBH 0320) Therefore, it appears to the Court that the Ghosh letter should be considered to be the initial denial, which was followed by the internal appeal denial by Dr. Gruber.

A residential rehabilitation program is appropriate when a member lacks the motivation or social support system to remain abstinent, but does not require the structure and intensity of services provided in a hospital.

Any one of the following criteria must be met . . .
1.  The member continues to use substances despite appropriate motivation and recent treatment in an intensive outpatient program or partial hospital/day treatment program.
2.  The member continues to use substances, and the member's functioning has deteriorated to the point that the member cannot be safely treated in a less restrictive level of care.
3.  The member continues to use substances, is at risk of exacerbating a serious co-occurring medical condition, and cannot be safely treated in a lower level of care.
4.  The member is at risk of developing withdrawal symptoms which cannot be safely treated in a lower level of care.
5.  Severe impairment in the member's family or social support system has heightened the risk that the member will use substances if not in residential rehabilitation.
6.  The member is experiencing withdrawal symptoms that do not compromise the member's medical status, but are of extreme subjective severity accompanied by the lack of resources or functional social supports to manage the symptoms.

And all of the following . . .
1.  The member is not at imminent risk of serious harm to self or others.
2.  Within 48 hours of admission, the following occurs:
a.  A psychiatrist/addictionologist completes a comprehensive evaluation of the member.
b.  The treating psychiatrist/addictionologist and, whenever possible, the member do the following:
i.  Develop a treatment plan . . .
ii.  Project a discharge date; and
iii. Develop an initial discharge plan . . .
3.  Subsequent psychiatric evaluations and consultations are available 24 hours a day.  Visits with the treating psychiatrist/addictionologist occur at least 2 times per week. . .
5.a. . . . Active treatment is indicated by services that are all of the following:
i.  Supervised and evaluated by a physician. . .
iv. Unable to be provided in a less restrictive setting; and are
v.  Focused on interventions that are based on generally accepted standards of medical practice and are known to address the critical presenting problem(s), psychosocial issues and stabilize the member's condition to the extent that the member can be safely treated in a lower level of care. . .

It is unclear what medical records were reviewed by Dr. Ghosh, as they are not listed in the letter. Contrary to the assertions by the defendants, the letter does not indicate Dr. Ghosh's medical specialty, if any, or other qualifications or certifications. Also, Dr. Ghosh does not specifically apply Boyd's situation to the 2010 Level of Care Guidelines; he simply states a conclusion that the treatment model (of Narconon) does not meet the 2011 guidelines.

D.  <u>Plaintiff Appeals the Denial Within the Plan</u>.

Plaintiff filed an appeal of the decision within the Plan. (The record does not appear to include the written letter of appeal which is referenced at UBH 0321). By letter dated May 23, 2012, the appeal was denied by Nelson Gruber, MD, Associate Medical Director, Board Certified in General Psychiatry, Diplomate, American Board of Psychiatry & Neurology.  Dr. Gruber's letter indicates that medical records were reviewed but does not specifically indicate what records were reviewed.   The letter states:

> The member's condition did not meet United Behavioral Health Level of Care Guidelines for the Substance Abuse Residential Rehabilitation Level of Care as evidenced by the following:
>
> Based on the available information - at the time of admission, the member was motivated, had already apparently been through detoxification and some programming and was sober.  He acknowledged his addiction and wanted to pursue recovery. There was no report of notable cravings or of dangerous ideations, substance related toxicities or medical issues, of acute or post acute withdrawal symptoms.  The member was caring for himself and was fully functional.  His mood was happy, upbeat and positive.  The member reported feeling well and was physically stable.  The member had strong family support.  The member remained in this stable and positive condition throughout his time in the program.  Based on the available information, the member could safely and effectively have been treated at a lower level of care.
>
> The following United Behavioral Health Level of Care Guidelines for the Substance Abuse Residential Rehabilitation Level of Care were considered:

10

1.  There is a risk of harm to self or others or pervasive impairment in functioning due to continued and severe substance use which prohibits treatment from occurring safely in a less restrictive environment.
2.  There are serious concomitant medical conditions due to continued substance use, which would prohibit treatment from occurring safely at a lower level of care and requires 24-hour monitoring.
3.  There is risk of further withdrawal symptoms, which cannot be safely managed without requiring 24-hour monitoring.
4.  There is no living environment that is supportive of abstinence and that does not place the member at high risk of substance induced dangerous behavior.
5.  There are withdrawal symptoms that do not compromise the member's medical status, but are of extreme subjective severity accompanied by the lack of resources or functional social supports to manage the symptoms.

This determination does not mean that you did not require additional health care or that you needed to be discharged.

(UBH 0291-0292)

The letter does not contain a diagnosis or diagnosis code and does not indicate what version of the UBH guidelines that he used.

E.  Independent Review

By letter dated November 19, 2012, counsel for the plaintiffs notified UBH of his representation and requested an independent external review by an Independent Review Organization ("IRO")[13] of the determinations of 10/19/12 and 5/23/12.  (UBH 0906-0912) Plaintiff's counsel also requested a full copy of the administrative record.  He enclosed, as a

_____

[13] The Patient Protection and Affordable Care Act (PPACA), 42 U.S.C. § 300gg-19(b) (2013), [as amended by the Healthcare and Education Reconciliation Act of 2010 (HCERA)] amended Part A of title XXVII of the Public Health Service Act (PHS Act) related to group health plans and health insurance issuers in the group and individual markets and sets forth requirements relating to internal and external review processes.  29 C.F.R. § 2590.715-2719. ERISA was also amended to provide that "the provisions of part A of title XXVII of the Public Health Service Act, 42 U.S.C. §§ 300gg et seq. (as amended by the PPACA) shall apply to group health plans . . . as if included in this subpart. . ."  29 U.S.C. § 1185d(a) (2012).  In Department of Labor Technical Release 2011-02, "[c]laimants must be allowed to submit to the IRO additional information in writing that the IRO must consider when conducting the external review . . ."  *See* Katherine T. Vukadin, *Hope or Hype?: Why the Affordable Care Act's New External Review Rules for Denied ERISA Healthcare Claims Need More Reform*, 60 Buff. L. Rev. 1201 (2012).

"supplement to the administrative record" medical records from Boyd's treatment at Three Rivers, medical records from Boyd's treatment at the Wilmington Treatment Center, medical records from Boyd's treatment at August West beginning July 13, 2010, medical records from Boyd's treatment at Narconon beginning July 23, 2010, and affidavits of Whitfield Boyd and Wayne Boyd.

The case was referred to Advanced Medical Reviews for the Independent External Review. In a report dated January 28, 2013 and provided to the plaintiffs by letter dated February 6, 2013, the denial decision was upheld. The report states that the dates of service were July 23, 2010 through December 18, 2010. It lists the medical records reviewed, including the following:

> 7. Admission medical evaluation by author illegible dated 7/13/2010, 8. Physician orders by author illegible dated 7/13/2010, 9. Progress notes by author illegible dated 7/13/2010-7/22/2010 multiple dates, 10. Discharge summary by Bernard J. Gottschalk, MD dated 3/1/2008, 11. Integrated progress note by Tom Foushee, MA dated 2/3/2008-2/29/2008 multiple dates, 12. Progress note by author illegible dated 2/2/2008-2/14/2008 multiple dates, 13. Physician orders by author illegible dated 2/2/2008-2/14/2008 multiple dates, 14. Continuing care/discharge summary by author illegible dated 2/2/2008, 15. Nurse admission note by author illegible dated 2/2/2008, 16. Discharge summary by Phyllis Mobley, MD dated 6/27/2006, 17. Physician's orders by author illegible dated 6/14/2006-6/27/2006 multiple dates.

(UBH 0256)

The reviewer also indicated that he had considered a case referral form from UBH, letters and faxes from Plaintiffs' counsel, the letters of Ghosh and Gruber, the 2012 level of care guidelines for U.S. behavioral health plan, the Benefits guide summary plan description, and the Practice Guidelines for Treatment of Patients with Substance Use Disorders Second Edition dated 2010. The reviewer does not state in the list of medical records reviewed that he considered any records from Narconon Vista Bay. However, the reviewer includes some information about Narconon in the "Patient Clinical Information":

The patient is a 25-year-old male who was admitted to residential rehabilitation treatment for substance use disorders at Narconon Vista Bay from 7/23/2010 through 12/18/2010 with diagnosis of 304.00 Opioid Dependence. This was his third episode of residential substance abuse rehabilitation treatment. He was admitted to Three Rivers in 2006 and Wilmington Treatment Center in 2007. He has never attended outpatient treatment. His substance abuse history began at age 14 and included alcohol, marijuana, cocaine, heroin, benzodiazepines, and hallucinogens. He had two prior DUI arrests and was hospitalized in 2007 following an accidental drug overdose. His longest period of voluntary abstinence was for approximately two months in 2007. His current drugs of choice at the time of admission were Xanax and Suboxone. The amounts and duration were not documented. His last drug use was between 7/12/2010 and 7/17/2010. Urine drug screen was negative on 7/24/2010. He had no psychiatric history and no chronic medical conditions. He was unemployed and living with his parents who were sober and supportive. The patient was admitted to the residential program under a "Standard Treatment Plan" consisting of four phases with a pre-determined length of stay: Phase One (5 weeks), Phase Two (6 weeks), Phase Three (5 weeks), and Phase Four (2 days to 1 week). He received drug and alcohol education, relapse prevention management, healthy lifestyle modeling, life skills group, individual case management, group sessions, and treatment planning. The medical record provided contains a record of "documentation of services" but no progress notes or formal treatment plan with updates. According to the discharge summary the patient did well and was discharged to a program in Lake Tahoe (level of care not specified).

(UBH 0257)

The reviewer then found that the treatment failed to meet the UBH **2012** Level of Care Guidelines for Residential Rehabilitation for Substance Use Disorders[14] and the APA Best Practice Guidelines for Treatment of Patients with Substance Use Disorders for the dates of service. He found:

The patient is a 25-year-old male with a history of substance abuse since age 14 and no prior outpatient treatment experience. There were no complicating medical or psychiatric comorbidities. His last drug use was at least one week prior to admission. He was motivated and cooperative and had no known contraindication to ambulatory care. The admission was not medically necessary. Consistent with

---

[14] Again, the treatment was in 2010, but even the external reviewer did not use 2010 guidelines. It is unclear if the external reviewer was sent the correct guidelines by UBH.

the recommendations of the APA Best Practice Guidelines. "Patients should be treated in the least restrictive setting that is likely to be safe and effective.".

(UBH 0257)

The reviewer then applied the 2012 guidelines:

Any ONE of the following criteria must be met
1. The member continues to use alcohol or drugs, and the member's functioning has deteriorated to the point that the member cannot be safely treated in a less restrictive level of care; or
-This criteria was not met. This was the patient's third episode of residential substance abuse rehabilitation treatment. He had never attended outpatient treatment. There was no history of continued use of substances while in a less restrictive level of care.
2. The member continues to use alcohol or drugs, is at risk of exacerbating a serious co-occurring medical condition, and cannot be safely treated in a lower level of care; or
-This criterion was not met. The patient has no co-occurring medical conditions or complications.
3. There is a high risk of harm to self or others due to continued and severe alcohol or drug use which prohibits treatment from safely occurring in a less restrictive level of care; or
-This criterion was not met. The patient was not suicidal, homicidal, or psychotic and had no psychiatric history. There was no evidence of high risk of harm to self or others due to continued substance abuse.
4. There is a high risk that continued use of alcohol or drugs will exacerbate a co-occurring medical condition to the extent that treatment in a less restrictive level of care cannot be safely provided; or
-This criteria was not met. The patient has no co-occurring medical conditions or complications.
5. There is a high risk of developing severe withdrawal symptoms which cannot be safely treated in a lower level of care; or
-This criteria was not met. The patient had no history of withdrawal.
6. The member is experiencing withdrawal symptoms that do not compromise the member's medical status to the extent that treatment in an inpatient setting is indicated, but the symptoms are of extreme subjective severity and the member lacks resources or a functional social support system needed to manage the symptoms in a lower level of care.
-This criterion was not met. At the time of admission the patient was stable. There was no history of continued use of substances while in a less restrictive level of care. The OptumHealth 2012 Level of Care Guidelines for Residential Rehabilitation for Substance Use Disorders were not met. The Medical Expenses Not Covered" section of the Summary Plan Description (SPD) states "Services and supplies which are not medically necessary, as determined by the claims administrator" are "not covered under the medical benefits of this Healthcare Program".
(UBH 0257)

The report indicates that a specialist in psychiatry served as the independent reviewer but does not provide his or her name.

F. <u>Plaintiffs File an Action in Federal Court</u>.

Plaintiffs initiated this action on March 6, 2013 for failure to pay benefits under 29 U.S.C. § 1132(a)(1)(B) and for failure to provide requested information pursuant to 29 U.S.C. §§ 1024(b)(4), 1132(a)(1)(A), and 1132(c).

During the litigation in this Court, the plaintiffs filed a motion for discovery on the basis that the defendants had produced an incomplete administrative record. The Court allowed limited discovery, including a request for production of claims management guidelines that were relied upon in making the benefit determination or which constitute a statement of policy or guidance regarding the plan, without regard to whether such advice or statement was relied upon in making the benefit determination. The defendants initially responded to this request for production by stating, "Included within the administrative record already produced." (ECF No. 46-2, p. 3) The defendants responded for a second time to the request for production in the same manner. (ECF No. 46-2, p. 13) By a Third Supplemental Responses to Plaintiffs' Request for Production, served in September of 2014, defendants produced a UBH "Coverage Determination Guideline" entitled "Residential Rehabilitation for Substance Use Disorders" dated August 2010. (ECF No. 46-4) This document states: INSTRUCTIONS FOR USE. This Coverage Determination Guideline provides assistance in interpreting behavioral health benefit plans that are managed by United Behavioral Health . . . When deciding coverage, the enrollee specific document must be referenced." The document also states as "Key Points" the following:

> Diagnosed Substance Use Disorders may require residential rehabilitation. Dependence Disorders according to the DSM, are characterized by a maladaptive pattern of substance use, leading to clinically significant impairment or distress as manifested by three or more of the following occurring at any time within the same 12-month period:
>> Increase in tolerance and/or diminished effect of substance

15

Symptoms of withdrawal
Increases in amount of use
A desire and failure to control substance use
Spending a great deal of time in substance related activities
Important social, interpersonal and occupational activities are neglected and
A known physical or mental condition has worsened with the continued use of substances.

United Behavioral Health maintains that the treatment of Substance Use Disorders in a residential setting should be consistent with nationally recognized scientific evidence as available, and prevailing medical standards and clinical guidelines.

Patients with Substance Use Disorders should be treated in a level of care that is most likely to prove safe and effective. Choice of residential rehabilitation is driven by the dominance of substance use in the patient's daily life and by the absence of a support system and a safe substance-free environment. The following should also be considered:

A history of continued and severe substance use despite appropriate motivation and recent treatment in an intensive outpatient or partial hospital program.

Risk of harm to self or others and/or pervasive impairment in functioning due to continued and severe substance use which prohibits treatment from occurring safely in a less restrictive environment.

The risk of exacerbation of serious concomitant medical conditions due to continued substance use, which prohibits treatment from occurring safely at a lower level of care and requires 24-hour monitoring.

Risk of withdrawal symptoms, which cannot be safely managed without requiring 24-hour monitoring.

Withdrawal symptoms that do not compromise the patient's medical status, but are of extreme subjective severity accompanied by the lack of resources or functional social supports to manage the symptoms.

The record contains no indication that this 2010 guideline was ever used in any assessment by any of the reviewers, even though it appears to be relevant.

**II.  Plaintiffs' Claim for Benefits**

Plaintiffs' argument is twofold. First, they argue that, while the scope of review in this case would normally be "abuse of discretion", instead it should be *de novo* as a result of numerous instances of alleged noncompliance with ERISA's procedural and substantive requirements. Secondly, Plaintiffs assert that regardless of whether the claims administrator's

16

decision is reviewed *de novo* or using the abuse of discretion standard, they would be entitled to benefits.

**A. Scope of Review**

Where an ERISA plan confers upon its administrator discretionary authority in the exercise of its power, the administrator's denial of benefits is reviewed under an abuse-of-discretion standard. *Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan,* 201 F.3d 335, 341 (4th Cir. 2000). Such a discretionary decision "will not be disturbed if reasonable, even if the court itself would have reached a different conclusion." *Id.* (citing *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 111 (1989)). The administrator's decision is reasonable "if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence," *Bernstein v. CapitalCare, Inc.,* 70 F.3d 783, 787 (4th Cir. 1995), which is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *English v. Shalala,* 10 F.3d 1080, 1084 (4th Cir. 1993) (citation omitted). In weighing the reasonableness of the plan administrator's determination, the Court may consider, but is not limited to, the following factors:

> (1) the language of the Plan; (2) the purposes and goals of the Plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the Plan and with earlier interpretations of the Plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest.

*Booth,* 201 F.3d at 342-43; *Champion v. Black & Decker (U.S.) Inc.,* 550 F.3d 353, 359 (4th Cir. 2008); *Williams v. Metropolitan Life Ins. Co.,* 609 F.3d 622, 630 (4th Cir. 2010).

<u>As to the claim for benefits, the court must apply an abuse of discretion standard</u>.

The Plan documents confer on Sysco discretion to interpret the plan. "The Plan Administrator has the sole, full and exclusive responsibility and discretionary authority to control and manage the operation and administration of the Plan (except to the extent the Claims or Appeals Administrator has such discretionary authority) and to interpret and construe the Plan and any disputed or doubtful terms . . ." (UBH 0884-885) The Plan Administrator may delegate its duties and discretionary authority to a third party Claims Administrator.[15]

The plaintiffs argue that numerous alleged violations of ERISA procedural requirements require that the Court engage in a *de novo* review. Plaintiffs cite *Abatie v. Alta Health & Life Insurance Co.*, 458 F.3d 955, 970 (9th Cir. 2006) ("Because an administrator cannot contract around the procedural requirements of ERISA, decisions taken in wholesale violation of ERISA procedures do not fall within an administrator's discretionary authority.) and *Rasenack ex rel. Tribolet v. AIG Life Ins. Co.*, 585 F.3d 1311, 1317 (10th Cir. 2009), citing *Finley v. Hewlett-Packard Co. Employee Benefits Org. Income Prot. Plan*, 379 F.3d 1168, 1173-74 (10th Cir. 2004) (Benefits determination reviewed *de novo* where the final determination was made in violation of timing requirements. However, "a plan administrator is in substantial compliance with a deadline if the delay is: '(1) inconsequential; and (2) in the context of an on-going, good-faith exchange of information between the administrator and the claimant.'"). Plaintiffs assert that Defendants violated ERISA's procedural requirements by (1) taking fifteen months to decide the claim; (2) ignoring the request for relevant materials in the claims file, depriving Plaintiffs of the opportunity

---

[15] The Plan defines the term "Claims Administrator" with respect to benefits provided on a self-insured basis as "the person or entity providing claims processing, payment, and other administrative services to the Plan". (UBH 0875)

to address them; (3) failing to keep a reliable administrative record and omitting key documents from that record; (4) issuing benefits decisions that failed to list or cite any medical records on which they were based, failed to cite the plan provision on which they are based, failed to consider the key documents in the record, and were otherwise incomprehensible.

Defendants assert that the remedy provided by the regulations for any failure to establish or follow claims procedures required by ERISA is to excuse a claimant's failure to exhaust administrative remedies, citing 29 C.F.R. § 2560.503-1(l).  They further assert that "the typical remedy when a fiduciary is found to have committed serious procedural irregularities that do not demonstrate substantial compliance with the ERISA guidelines is to remand the claim to the plan administrator for a full and fair review under the correct procedures, rather than to heighten the standard of review." *Arnold ex rel. Hill v. Hartford Life Ins. Co*., 527 F.Supp.2d 495 n. 4 (W.D. Va. 2007), citing *Berry v. Ciba-Geigy Corp*., 761 F.2d 1003, n. 4 (4th Cir. 1985) and *Wertheim v. Hartford Life Ins. Co*., 268 F.Supp.2d 643, 664 (E.D.Va. 2003) (Remand may cause delay, but it "fosters the strong policy favoring the internal administrative resolution of ERISA claims and ensures that plaintiff receives all of the procedural protections to which he is entitled under the regulations.") The Court agrees with the defendants that the effect of any procedural irregularities would be to excuse a failure by a claimant to exhaust administrative remedies and possibly to remand the case, rather than to change the standard of review by this Court of the plan administrator's decision.  Therefore, the Court finds that an abuse of discretion standard would apply to a review of the matter on its merits.  However, due to the Court's concern regarding irregularities in the administrative review process by the claims administrator, UBH, the Court remands the matter as further explained below.

**B. <u>Were the denials inconsistent with the procedural and substantive requirements of ERISA?</u>**

Fiduciaries' noncompliance with ERISA's "procedural and substantive requirements" is one of the factors listed in *Booth* indicating an abuse of discretion. 201 F.3d at 342-43. Even where the overall standard of review is abuse of discretion, whether a benefits denial letter complied with the applicable ERISA regulations "is a question of law, and therefore, subject to *de novo* review." *Brogan v. Holland*, 105 F.3d 158, 165 (4th Cir. 1997). However, as long as there is "substantial compliance" with the ERISA regulations, a procedural defect will not invalidate a plan administrator's decision. *Id.*

**Were the Denials Communicated in a Timely Manner?**

The Court will first discuss Plaintiffs' assertion that UBH failed to inform them of its coverage decision within the time frame required by ERISA. The required time frame for notification of a benefits decision by group health plans is set out in 29 C.F.R. § 2560.503-1(f)(2)(iii).[16] For "pre-service claims", the plan administrator must notify the claimant of its benefits decision "within a reasonable period of time appropriate to the medical circumstances, but not later than 15 days after receipt of the claim by the plan." *Id.* at subsection (A). This period may be extended under certain circumstances by an additional fifteen days. "If such an extension is necessary due to a failure of the claimant to submit the information necessary to decide the claim, the notice of extension shall specifically describe the required information, and the claimant shall be afforded at least 45 days from

---

[16] Plaintiffs contend that the applicable regulation is 29 C.F.R. § 2560.503-1(f)(2)(i) for urgent care claims, for which the plan requires a shorter turnaround for claims processing. The Court disagrees. The Summary Plan Description defines an "urgent care claim" as "any pre-service claim or concurrent care decision (described below) that must be reviewed quickly in order to avoid jeopardizing your life, health, or ability to regain maximum function or would, in the opinion of a physician with knowledge of your medical condition, subject you to severe pain that cannot be adequately managed without the care or treatment that is the subject of the claim. An example of this type of claim would be a request for prior approval of a diagnostic test for appendicitis." (UBH 0131-0132)

receipt of the notice within which to provide the specified information." *Id*. For "post-service claims", the administrator is allowed 30 days after receipt of the claim to notify the claimant of a decision. Section 2560.503-1(f)(2)(iii)(B). The period may be extended under some circumstances for an additional 15 days, and if the extension is necessary due to the failure of the claimant to furnish information then the notice shall specifically describe the information and the claimant shall be given at least 45 days after receipt of the notice to provide specified information.

Defendants contend that, even if Wayne Boyd did call UBH on July 14, 2010 as he stated in his affidavit, Plaintiffs' claim was a post-service claim regarding Boyd's admission to August West and that an authorization to enter Narconon could only have been given after he successfully completed detox at August West. They contend that the first call from Wayne Boyd that related to the Narconon stay was on October 7, 2010, after Boyd began his stay there on July 23, 2010. Defendants also assert that the time to notify a claimant about a post-service denial does not begin to run until after the denying party receives a written claim. *See* 29 C.F.R. 2560.503-1(f)(2)(iii). Here, Defendants assert that Narconon first notified UBH in writing about the claim on January 24, 2011, when it submitted a barebones invoice. (UBH 303–04.) They further contend that UBH issued an explanation of benefits requesting additional information from Narconon on March 22, 2011 (UBH 303–04) and that when Narconon provided records on June 24, 2011, they were incomplete. (UBH 317, 534–598.) Finally, they assert that Narconon submitted additional records on September 29, 2011 (UBH 318, 328–533), and once it had sufficient information to consider the claim UBH issued an explanation of benefits of the claim as not medically necessary on October 12, 2011. (UBH 305–06)

The Court finds based on the affidavit of Wayne Boyd that he called UBH on July 14, 2010 and made a pre-service claim for the anticipated treatment at Narconon. Although the UBH internal case notes do not contain any notation concerning the call, the plaintiff has asserted that a "telephone

21

communication . . . did not appear to be documented in the record, as well as other internal communications among persons considering the claim that were absent (from the administrative record) but that would typically be found in the record." (Jt. Cert., ECF No. 48, p, 2)   The Court cannot rely on the absence of a notation in the UBH notes to find that Wayne Boyd did not make the July telephone call.  However, the record also reflects that Narconon apparently did not send complete information concerning the claim to UBH until September of 2011. Therefore, the Court cannot find that the claims administrator did not process the claim on time.

**Did Defendants repeatedly lose documents and fail to properly compile the administrative record?**

Plaintiffs contend that both during the administrative phase and during the litigation, Defendants have "shown little grasp that a Plan even existed, or whether the administrative record was complete." (Pl. Memor., ECF No. 46, p. 18) The record does support the plaintiffs' allegations to some extent. For example, the denial and appeal letters did not reference a plan provision[17], and Plaintiffs' counsel objected during this litigation that the administrative record did not contain the governing plan document.  *See* affidavit of Blancey Coskrey submitted in support of Plaintiffs' Motion for Discovery, ECF No. 15-2.  Defendants then added the plan document to the administrative record.  Plaintiffs' counsel also objected during the litigation in this Court to the omission from the administrative record of the November 19, 2012 letter to UBH from Plaintiffs' counsel and the Wayne Boyd affidavit, a January 14, 2013 letter from the outside reviewer to Boyd, the letter of January 18, 2014 from Plaintiffs' counsel to the reviewer, and an enclosure to the second denial letter dated May 23, 2012. Plaintiffs also object to the inclusion in the record of the APA document relied upon by Dr. Ghosh.

---

[17] The failure of Dr. Ghosh and Dr. Gruber to reference any provision of the Plan is discussed hereinbelow.

Defendants indicate that they did not have all of the letters between Plaintiffs' counsel and the external reviewer but agreed to add them to the record. Defendants also contend that the plaintiffs' criticisms are not relevant because they relate to matters that occurred after the internal denial and review had taken place. The defendants apparently did not have all of the letters between Plaintiffs' counsel and the external reviewer. However, the Court is troubled by the failure of the administrative record assembled by the defendants to contain the Plan document or the letter requesting the external review with attachments. This would seem to indicate that the internal reviewers may not have had the plan document, which they had the duty to interpret. The over-all sloppiness in assembling the record would not seem to be the fault of their legal counsel, who simply rely on the administrator to provide them with the record. Therefore, the Court finds that the plaintiffs' complaints about the omissions from the administrative record are well-founded and weigh in favor of a finding that they were denied a full and fair review. The Court finds that the APA standards were properly included in the record because a link to those standards was provided in the letter of Dr. Ghosh.

**Failure of UBH to Respond to Plaintiffs' Request for the Documents Underlying its Decision**

In the November 2012 letter requesting an external review, Plaintiffs' counsel also requested "a full copy of the administrative record . . . (The request) includes all documentation or other information in the possession of the company relevant to the claim, including specifically any information that was not used, not considered, or rejected." (UBH 0906) It is uncontroverted that Defendants never complied with this request. ERISA requires plans to maintain reasonable claims procedures. Included in this duty is providing claimants with a reasonable opportunity for a full and fair review. 29 U.S.C. § 1133. In providing the opportunity for a full and fair review, the procedures must "[p]rovide that a claimant shall be provided, upon request and free of charge, reasonable access

to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits." 29 C.F.R. § 2560.503-1(h)(2)(iii).

> A document, record, or other information shall be considered "relevant" to a claimant's claim if such document, record, or other information
> (i) Was relied upon in making the benefit determination;
> (ii) Was submitted, considered, or generated in the course of making the benefit determination, without regard to whether such document, record, or other information was relied upon in making the benefit determination;
> (iii) Demonstrates compliance with the administrative processes and safeguards required pursuant to paragraph (b)(5) of this section in making the benefit determination; or
> (iv) **In the case of a group health plan or a plan providing disability benefits, constitutes a statement of policy or guidance with respect to the plan concerning the denied treatment option or benefit for the claimant's diagnosis, without regard to whether such advice or statement was relied upon in making the benefit determination.**

*Id.* at (m)(8)(emphasis added).

Defendants contend that the right to request documents refers only to the time frame after the initial denial but before the internal review and that Plaintiffs did not request the documents until after the internal review had occurred. (ECF No. 51, p. 13) Defendants do not cite any case law in support of this argument. The Tenth Circuit addressed related issues in *Metzger v. UNUM Life Ins. Co.*, 476 F.3d 1161, 1166-68 (10th Cir. 2007). It found that "the regulations mandate provision of relevant documents, including medical opinion reports, at two discrete stages of the administrative process. First, relevant documents generated or relied upon during the initial claims determination must be disclosed prior to or at the outset of an administrative appeal. *See* 29 C.F.R. § 2560.503-1(h)(2)(iii). Second, relevant documents generated during the administrative appeal–along with the claimant's file from the initial determination–must be disclosed after a final decision on appeal. *See* 29 C.F.R. § 2560.503-1(i)(5)." The Tenth Circuit cited the Department of Labor's description of the amendments of 2000 which included subsection (m)(8) as follows:

> (The Department) believes that this specification of the scope of the required

disclosure of "relevant" documents will serve the interests of both claimants and plans by providing clarity as to plans' disclosure obligations, *while providing claimants with adequate access to the information necessary to determine whether to pursue further appeal.* ERISA Claims Procedure, 65 Fed. Reg. 70,246, 70,252 (Nov. 21, 2000) (emphasis added by Tenth Circuit)

*See also, Skipp v. Hartford Life Ins. Co*., No. CCB-06-2199, 2008 WL 346107 at *10 (D. Md. Feb. 6, 2008) This is consistent with the Fourth Circuit's observation in *Ellis v. Metropolitan Life Ins. Co*., 126 F.3d 228, 235 (4th Cir. 1997) (internal citations omitted)(emphasis added):

Both the specific minimum procedural review requirements of subsection (g)(1) and the notice requirements of the decision on review of subsection (h)(3) have been read as ensuring that a full and fair review is conducted by the administrator, **that a claimant is enabled to prepare an appeal for further administrative review or recourse to the federal courts**, and that the courts can perform the task, entrusted to them by ERISA, of reviewing a claim denial.  Compliance that substantially fulfills these goals suffices.

In the absence of definitive Fourth Circuit guidance, this Court finds the reasoning of the Tenth Circuit to be persuasive.  In addition to requiring an administrator to provide documents to the claimant upon request after the denial of benefits, documents must also be provided upon request after the internal plan appeal, so that the claimant can fully evaluate the advisability of requesting an external review or appealing to federal court.  Here, the claimant's counsel requested the full administrative record after the conclusion of the internal appeal and before the independent external review occurred, and the administrator ignored the request.  This would support a finding that the administrator failed to comply with the procedural requirements of ERISA.

**Did the Denial Letter Fail to Comply with ERISA Requirements?**

ERISA requires a claims administrator to provide in its denial letter the "specific reasons" for the denial of benefits and to afford the claimant a reasonable opportunity for a "full and fair

review".   29 U.S.C. § 1133.   The corresponding regulation sets forth what the notice must

contain:

> The notification shall set forth, in a manner calculated to be understood by the claimant--
> (i) The specific reason or reasons for the adverse determination;
> (ii) Reference to the specific plan provisions on which the determination is based;
> (iii) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary;
> (iv) A description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under section 502(a) of the Act following an adverse benefit determination on review;
> (v) In the case of an adverse benefit determination by a group health plan or a plan providing disability benefits,
>> (A) If an internal rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination, either the specific rule, guideline, protocol, or other similar criterion; or a statement that such a rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination and that a copy of such rule, guideline, protocol, or other criterion will be provided free of charge to the claimant upon request; or
>> (B) If the adverse benefit determination is based on a medical necessity or experimental treatment or similar exclusion or limit, either an explanation of the scientific or clinical judgment for the determination, applying the terms of the plan to the claimant's medical circumstances, or a statement that such explanation will be provided free of charge upon request.

29 C.F.R. § 2560.503-1(g)(1).

"Several circuit courts of appeal, including our own, have warned plan administrators to

provide 'specific reasons,' rather than question-begging conclusions, to support their decisions."

*O'Dell v. Zurich American Ins. Co.*, No. 2:13-12894, 2015 WL 5724376 at * 25 (S.D.W.Va.

September 29, 2015), citing *Weaver v. Phoenix Home Life Mut. Ins. Co.*, 990 F.2d 154, 158 (4th

Cir. 1993) (emphasis in original), and *Sellers v. Zurich Am. Ins. Co.*, 615 F. Supp.2d 816, 821-22

(E.D. Wisc. 2009) (A "bare unsupported conclusion" that did not "explain how [the plan

administrators] reached the[ir]conclusion" did not meet ERISA's requirements). *See Weaver v. Phoenix Home Life Mut. Ins. Co.*, 990 F.2d 154 (4th Cir. 1993) (reason given by Plan was a conclusion).

Here, both UBH letters failed to even refer to any specific plan terms on which the denial was based and failed to give specific reasons for the denial, much less even reference the 2010 guidelines.  Defendants assert that the 2010 and 2011 guidelines were substantially similar.  While this is good argument by counsel, there is nothing in the record by any reviewer making this statement or conclusion, and the Court should not be forced to speculate and attempt to compare 2011 and 2012 guidelines to the 2010 guidelines.  No one has submitted any plan language that allows the substitution of one year's standard for another. The internal reviewers also failed to provide the types of information needed to establish eligibility.

Defendants assert that both decisions by UBH specifically discuss concepts included in the medical necessity definition and level of care guidelines. Dr. Ghosh found the Narconon treatment model did not meet the UBH Level of Care Guidelines, as he characterized the program as educational and referred to detoxification being accomplished by the use of nutritional supplements and saunas. Dr. Gruber based his decision on the fact that Boyd did not need to be treated at the higher residential level of care, finding instead that services could safely have been provided at a lower level of care. However neither reviewer states a specific basis for the denial, indicates what medical records were reviewed, or applies the guidelines to any medical evidence.  They also do not reference any plan provision.  Instead of focusing on Dr. Ghosh's rationale that the treatment model failed to meet the UBH guidelines, Dr. Gruber found that Boyd did not need the residential level of care and could have utilized outpatient treatment. Defendants argue this is consistent with the SPD, which discusses levels of care for mental health services. (UBH 171; *see also* UBH 115 (requiring that for treatment to be

27

medically necessary it must be appropriate for the diagnosis, care, or treatment of the disease involved).) However, neither Ghosh nor Gruber mentioned the SPD at all.  This Court cannot consider new arguments made in this Court to support the denial of benefits.  In fact, the Court's review "is limited to the reason stated in the denial notice."  *Schindler v. Unum Life Ins. Co.*, No. 3:12-cv-00293-JFA, 2013 WL 4499146 at * 24 (D.S.C. August 19, 2013), citing *Thompson*, 30 F. App'x at 164 and *Hall v. Metropolitan Life Ins. Co.*, 259 F. App'x 589, 593 (4th Cir. 2007).

> The safeguards in 29 U.S.C. § 1133 and the implementing regulations "have been read as ensuring that a full and fair review is conducted by the administrator, that a claimant *is enabled to prepare an appeal for further administrative review* or recourse to the federal courts, and that the courts can ... review[ ] a claim denial." *Ellis[18]*, 126 F.3d at 236–37 (emphasis added). For that reason, this court has previously held, albeit in an unpublished opinion, that 29 U.S.C. § 1133 and 29 C.F.R. § 2560.503–1 require that judicial review be "limited to whether the rationale set forth in the *initial* denial notice is reasonable." *Thompson v. Life Ins. Co. of N. Am.,* 30 Fed.Appx. 160, 164 (4th Cir.2002) (unpublished) (emphasis added); *see also Robinson v. Aetna Life Ins. Co.,* 443 F.3d 389, 393 (5th Cir.2006) (holding that under § 1133 the administrative review must focus on the specific reason for the administrator's decision cited in the initial denial notice); *Abatie v. Alta Health & Life Ins. Co.,* 458 F.3d 955, 974 (9th Cir.2006) ("[A]n administrator that adds, in its final decision, a new reason for denial, a maneuver that has the effect of insulating the rationale from review, contravenes the purpose of ERISA."); *McCarthy v. Nat'l City Corp.,* 419 F.3d 437, 446 (6th Cir.2005) (holding that an administrator was not in substantial compliance with § 1133 where the initial denial notice omitted one of the grounds later relied on for the denial of benefits); *Abram v. Cargill, Inc.,* 395 F.3d 882, 886 (8th Cir.2005) (noting that ERISA's procedural requirements are intended to generate a "meaningful dialogue" between claim administrators and beneficiaries and to avoid beneficiaries being "sandbagged by post-hoc justifications of plan decisions") (internal quotations omitted); *Juliano v. Health Maint. Org. of N. J., Inc.,* 221 F.3d 279, 287 (2d Cir.2000) (same).

*Id.*

The Supreme Court has held that ERISA "sets forth a special standard of care upon a plan administrator, namely, that the administrator discharge [its] duties in respect to discretionary claims

---

[18] *Ellis v. Metropolitan Life Ins. Co.*, 126 F.3d 228 (4th Cir. 1997).

processing solely in the interests of the participants and beneficiaries of the plan; it simultaneously underscores the particular importance of accurate claims processing by insisting that administrators provide a full and fair review of claim denials, and it supplements marketplace and regulatory controls with judicial review of individual claim denials." *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 115 (2008) (internal citations and quotations omitted). The Fourth Circuit has described the procedural framework of ERISA as follows:

> In enacting ERISA, Congress established procedural safeguards to ensure that fiduciaries would administer employee benefit plans solely in the interest of the participants and beneficiaries. Fiduciaries must provide full and fair reviews of claims for benefits. Plan administrators are required to state the reason(s) for a denial and provide the specific plan provision(s) that formed the basis of the decision. Fiduciaries must notify claimants of their decisions in writing and in language likely to be understood by one of ordinary intelligence. The decision must be objectively reasonable and based on substantial evidence.
>
> These procedural safeguards are at the foundation of ERISA. Fiduciary compliance is essential to upholding the administrative integrity of this statutory scheme. For these reasons, courts generally find abuse of discretion where a fiduciary neglects his responsibilities.

*Thompson v. Life Ins. Co. of North America*, 30 F. App'x 160, 163 (4th Cir. 2002) (internal quotations and citations omitted).

The Fourth Circuit has further explained that "[n]ot all procedural defects will invalidate a plan administrator's decision if there is 'substantial compliance' with the regulation. To substantially comply with the regulation, the Trustees must have supplied the beneficiary 'with a statement of reasons that, under the circumstances of the case, permitted a sufficiently clear understanding of the administrator's position to permit effective review.'" *Brogan v. Holland*, 105 F.3d 158 at 165 (4th Cir. 1997).

Here, the Court finds that the administrative denial by Dr. Ghosh dated October 18, 2011 failed to substantially comply with the ERISA regulation. First, it does not reference any plan provision and states that no diagnosis or diagnosis code was available. Ghosh applied the 2011 UBH guidelines to the claim instead of the 2010 guidelines which were in effect at the time the claim was filed. Dr. Ghosh did not apply the guidelines to the medical record or even indicate which medical records were reviewed. The review by Dr. Gruber suffered from similar deficiencies and also denied the claim on different grounds from Dr. Ghosh.[19] If the reviewer on the internal appeal denies the claim on different grounds from the initial denial, then regulations and case law require that the Plan afford the claimant another internal appeal, which did not occur. Therefore, the Court finds that the failure by the claims administrator to comply with the ERISA regulatory requirements regarding the contents of the denial notice and the insertion of a new ground for denial by Dr. Gruber militates in favor of a remand of the case back to the claims administrator to begin the review process anew and comply with ERISA.

In considering the above failures by UBH to comply with the requirements of ERISA, the Court finds that it must remand this matter to the claims administrator for a "full and fair review".

C. **Did the defendants fail to consider many medical records and the affidavits of the Boyds?**

Plan administrators are fiduciaries. As part of the fiduciary duty to beneficiaries, ERISA "requires a balance between 'the obligation to guard the assets of the trust from improper claims, as well as the obligation to pay legitimate claims.' *Harrison v. Wells Fargo Bank, N.A.*, 773 F.3d

---

[19] The plaintiff focuses much discussion concerning the alleged failure by the external reviewer to satisfy the requirements of the regulation. However, this Court is not reviewing the IRO's decision. The IRO is not vested with discretion to interpret the plan and is not an entity regulated by ERISA. Therefore, the Court will not review the IRO decision or consider the rationale of the decision or the medical evidence recited by it.

15, 20-21 (4ᵗʰ Cir. 2014). "While the primary responsibility for providing medical proof of disability undoubtedly rests with the claimant, a plan administrator cannot be willfully blind to medical information that may confirm the beneficiary's theory of disability where there is no evidence in the record to refute that theory. ERISA does not envision that the claims process will mirror an adversarial proceeding where 'the [claimant] bear[s] little or no responsibility to seek clarification when the evidence suggests the possibility of a legitimate claim.' Rather, the law anticipates, where necessary, some back and forth between administrator and beneficiary." *Id*. at 21 (internal citations omitted).

An administrator must use a "deliberate, principled reasoning process and . . . support its decision with substantial evidence. A complete record is necessary to make a reasoned decision, which must 'rest on good evidence and sound reasoning; and . . . result from a fair and searching process. A searching process does not permit a plan administrator to shut his eyes to the most evident and accessible sources of information that might support a successful claim." *Id*. (internal citations omitted) The Fourth Circuit emphasized, however, that it adopted a "narrow principle" and that the decision did not "undercut claimant's responsibility to provide medical information nor impose a duty on plan administrators to fish for medical information on the mere possibility that it may be helpful in some remote way." *Id*. at 24-25.

Plaintiffs assert that Defendants failed to consider the August West medical records between July 13 and 23 for Boyd's medically supervised drug withdrawal. They also assert that the IRO erroneously failed to consider the affidavits of Boyd and his father. First, as already noted, this Court is not reviewing the decision by the IRO. Therefore, as it is clear that the plaintiffs' affidavits were submitted for the first time to the IRO and were not submitted to Drs. Ghosh and

31

Gruber, the plaintiff can show no error relating to the failure of UBH to consider the affidavits. Regarding the August West records, it is not clear when they were submitted for the first time, as Ghosh and Gruber do not mention them. As already noted, they do not list any medical records that were reviewed. In order to evaluate whether the treatment met the internal guidelines[20], the internal reviewers should have listed the medical records reviewed and requested information from the plaintiffs concerning Boyd's previous detox treatment at August West.

Plaintiffs also assert that UBH failed to consider an internal guideline that Defendants failed to disclose to the plaintiffs until responding to discovery during this lawsuit. This document is entitled "Residential Use Determination for Substance Abuse Disorders" and is attached as Exhibit D to the Plaintiff's Memorandum in Support of Judgment. (ECF No. 46-4, pp. 7-22) Defendants contend this is an educational document that was not included in the administrative record because it was not relied upon. Defendants contend that the document educates reviewers about residential treatment and guides them in applying the Level of Care Guidelines. They cite the document as follows: "When the requested residential rehabilitation service or procedure is limited or excluded from the enrollee's benefit document, or is otherwise defined differently, it is the terms of the enrollee's benefit document that prevails." (Exhibit D to Pls.' Br. At 4) Defendants further contend that the document makes clear that treatment at

---

[20] For example, one of the criteria listed in the level of care guidelines is "[r]isk of withdrawal symptoms, which cannot be safely managed without requiring 24-hour monitoring." (2010 Guidelines, p. 1, UBH 0235) Also, although the defendants now assert that the remaining requirements of the guideline were not met such as an evaluation by a psychiatrist/addictionologist, a treatment plan, and a discharge plan, there has been no evaluation of such by the claims administrator. The record does indicate that "[u]pon admittance the client received an immediate medical exam and psychosocial assessment in our drug withdrawal facility . . ." (Letter of Narconon Vista Bay dated Dec. 31, 2010, p. 1, UBH 0539) The Narconon letter also references supervision by "the medical director & residential RN"; "[t]he client's strong subjective drive to use the substance in larger amounts and over a long period despite its negative effects such as physical deterioration from persistent use such as skin changes, liver and cognitive damage & depression." *Id.* The letter also refers to "Treatment Goals" and "Treatment Plan". *Id.*, p. 2.

Narconon would fall outside the scope of coverage because the document specifically excludes services that in the reasonable judgment of UBH is "not consistent with generally accepted standards of medical practice . . . , not consistent with services backed by credible research . . . , and is not consistent with United Behavioral Health's level of care guidelines . . ." The document lists the following services as being inappropriate for the treatment of substance use disorders: "A mis-match between the severity of symptoms and the choice of residential rehabilitation . . . The patient's co-occurring symptoms have stabilized and the substance use disorder can likely be managed in a less restrictive level of care." *Id.* at 12-13.

In reviewing the document, the Court observes that it has a "Guideline Number" and was approved in August of 2010. The guideline's "Key Points" regarding residential rehabilitation states that the DSM would find Dependence Disorders "as manifested by three or more of the following occurring at any time within the same 12-month period: Increase in tolerance and/or diminished effect of substance, symptoms of withdrawal, increases in amount of use; a desire and failure to control substance use, spending a great deal of time in substance related activities, important social, interpersonal and occupational activities are neglected and a known physical or mental condition has worsened with the continued use of substances." It also provides other factors that arguably would be present with Boyd. This internal "educational" document for reviewers was never disclosed to Plaintiffs' counsel until during this litigation and was not even mentioned by Ghosh or Gruber. Nor do Ghosh and Gruber mention the UBH 2010 guideline document. UBH should have disclosed this internal guideline to Plaintiff's counsel upon his request made in November of 2012. *See* 29 C.F.R. § 2560.503-1(h)(2)(iii), discussed above. "Thus, a participant who is denied access to internal guidelines that relate to her unsuccessful

33

claim for benefits may be able to show that she was denied full and fair review of the denial by the claims administrator." *Mondry v. American Family Mut. Ins. Co*., 557 F.3d 781, 798 (4th Cir. 2009). Here, the request for information regarding the claim was not made until after the internal appeal had been completed and counsel appeared for the plaintiffs. However, as discussed hereinabove, the rationale behind the regulation applies, not only to the time immediately after the initial denial but also to the time after the internal appeal. The claims administrator should, in this Court's opinion, consider all internal guidelines, not just the ones less favorable to the claimant.[21] *See Doe v. Travelers Ins. Co*., 167 F.3d 53 at 60 (1st Cir. 1999) ( The court found that failing to provide the claimant with a copy of mental health guidelines did not violate 29 U.S.C. § 1132(c) but that "[t]his does not mean that the failure to provide 'a full and fair review' required by the regulations is without consequences or that no 'pertinent document' need ever be produced for such review without a specific reference. The district court thought the denial of Doe's claim flawed by just such missteps in this case–an issue we have found it unnecessary to reach.") On remand, the claims administrator should consider the internal guideline that was produced late and determine its applicability.

D. **Does UBH have a history of biased claims administration**?

---

[21] An administrator's internal guidelines for healthcare benefits should be added to the administrative record when they are relevant to determining whether the administrator abused its discretion. *Tebo v. Sedgwick Claims Management Services, Inc*., 848 F.Supp.2d 39, 48 (D. Mass. 2012). *See Mullins v. AT&T Corp*., 290 Fed. App'x 642 (4th Cir. 2008) (In connection with the claim, counsel requested the policy and all other plan documents and sought discovery in district court of the claims-processing manual, protocols, or internal guidelines. The plaintiff argued that "she could not demonstrate that the materials considered by Connecticut General were inadequate or challenge the quality of its decisionmaking process without being able to see . . . the information and processes that Connecticut General itself had determined were necessary for resolving disability claims." The Fourth Circuit agreed and ordered production to the plaintiff of "*all* claims-processing documents that are relevant to her claim for long-term disability benefits, including those documents setting forth procedures". The First Circuit has held that internal guidelines are relevant where they have been authenticated, have been adopted by the administrator, concern the plan provisions in question and the issues in the case, are used consistently, and "were known or should have been known by those who made the decision to deny the claim." *Glista v. Unum Life Ins. Co. of America*, 378 F.3d 113, 123 (1st Cir. 2004).

Plaintiffs cite an unpublished Ninth Circuit case, *Lukas v. United Behavioral Health*, 504 Fed. Appx 628 (9th Cir. 2013) in support of their argument that UBH has a history of biased claims administration. A district court within this circuit has also found that UBH engaged in "unprincipled and unreasonable claims review" regarding the level of care guidelines for inpatient mental health treatment. *L.B. ex rel. Brock v. United Behavioral Health, Inc*., 47 F. Supp.2d 349, n. 6 (W.D.N.C. 2014). *See also, Allen G. V. United Behavioral Health*, No. A-112-CA-335-SS, 2013 WL 10939274 (W.D. Tx. March 13, 2013) (case involving level of care guidelines for mental health residential treatment where court found Plaintiffs were denied a full and fair review). The Court finds that UBH appears to have failed in other cases to provide claimants with a full and fair review, and this further supports this Court's remand of the case to the claims administrator.

## III.  Attorney's Fees and Costs

Plaintiff has requested attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g). Section 1132(g) states in part that "[i]n any action under this subchapter . . . by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(1). The Fourth Circuit has adopted a five-factor test to guide courts' discretion in determining whether an attorneys' fee award is warranted under ERISA.  The five factors are: (1) degree of opposing parties' culpability or bad faith; (2) ability of opposing parties to satisfy an award of attorneys' fees; (3) whether an award of attorneys' fees against the opposing parties would deter other persons acting under similar circumstances; (4) whether the parties requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and (5) the relative merits

of the parties' positions. *Quesinberry v. Life Ins. Co. Of N. Am.,* 987 F.2d 1017, 1029 (4th Cir. 1993). The Court, in its discretion, is denying the request for attorney's fees without prejudice at this time to encourage and afford the parties an opportunity to mediate the case again. Mediation should occur within sixty days of this order.

### Conclusion

For the reasons stated above, the case will be remanded to the claims administrator to consider the administrative record[22] and the relevant plan provisions and internal guidelines for the correct year and begin the review process anew. The plaintiffs' request for attorney's fees is denied without prejudice to their right to request same after mediation if they cannot resolve the case, and any renewed request should be filed within ten (10) days after mediation. The Court has not made a decision as to any entitlement to attorney's fees. To afford time to mediate, the Court will stay the case for sixty (60) days. If the case is not resolved, then it will be remanded in accordance with this order, and Plaintiffs' counsel may file another request for attorney's fees for the Court to consider.

**IT IS SO ORDERED**.

Florence, SC                                                        s/ R. Bryan Harwell
December 1, 2015                                                  R. Bryan Harwell
                                                                          United States District Judge

---

[22] The claims administrator shall consider the entire administrative record before this Court, including the affidavits and the medical records submitted by the plaintiff's attorney to the plan at the time the external review was requested. *See Brodish v. Federal Express Corp.*, 384 F. Supp.2d 827, 834 (D. Md. 2005), citing *Estate of Bratton v. National Union Fire Inc. Co. of Pittsburgh*, 215 F.3d 516, 521 n. 5 (5th Cir. 2000).